1    WO

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7               **FOR THE DISTRICT OF ARIZONA**

8

|  |  |
|---|---|
| Branden Adkins, et al., | No.  CV 12-1615-PHX-RCB (JFM) |
| Plaintiffs, |  |
| vs. | **O R D E R** |
| Corrections Corporation of America, et al., | **(FILED UNDER SEAL)** |
| Defendants. |  |

       Plaintiffs, 21 inmates from the State of Hawaii who are or were in the custody of Corrections Corporation of America (CCA) at the Saguaro Correctional Center (SCC) in Eloy, Arizona, filed this civil rights action under 42 U.S.C. § 1983 alleging violations of the Eighth Amendment and supplemental state law claims against CCA, the State of Hawaii (SOH), and various CCA and SOH employees.[1]  Defendants CCA, Samberg, Garcia, Lopez, Schneider, Rocha, Cook, Ondolich, Romero, Gawlik, and Cantey (Defendants) move for partial summary judgment.[2]  (Doc. 61.)  Plaintiffs oppose.  (Doc. 67.)

       The Court will grant the motion in part and deny it in part.

---

[1] Plaintiffs are represented by counsel.

[2] These Defendants request oral argument.  (Doc. 73.)  The remaining Defendants—SOH and John Ioane—did not join the motion.

1  **I.     Background**

2       Plaintiffs' claims arose following a disturbance in the Hotel Unit, Alpha pod at

3  SCC on July 26, 2010.  Defendants assert that approximately 20-25 Hawaiian inmates,

4  many of whom are Plaintiffs from two Security Threat Groups (STG or gangs), fought

5  during the disturbance.  Staff entered the pod but was forced to retreat; the STG

6  Coordinator, a Lieutenant, was unable to do so and was severely beaten by several

7  inmates, including eight Plaintiffs who were convicted in Superior Court, Pinal County,

8  of Attempted Deadly or Dangerous Assault by a Prisoner.  (DSOF, Exs. C-1 – C-8 (Doc.

9  62-2 at 16-66).)

10      Following the incident, certain inmates were placed in administrative segregation

11 pending an investigation for possible disciplinary charges; Defendants assert that those

12 placed in segregation were inmates suspected of participating in the fight, assaulting the

13 lieutenant, charging staff or refusing to lockdown.  (DSOF ¶ 4.)  Plaintiffs allege they

14 were threatened and coerced into making statements and beaten and kicked when they

15 refused.  (Doc. 8, First Am. Compl. (FAC).)   Plaintiffs also allege that their conditions of

16 confinement included being stripped to their underwear and kept in the cold; deprivation

17 of property, including inmate handbooks and writing materials; denial of clothing and

18 bedding; withholding of hygiene items, including a workable toothbrush and razor and

19 adequate toilet paper; and interference with the mail.  (*Id.*)

20      Plaintiffs filed a case in the First Circuit Court for the State of Hawaii, Civil No.

21 10-1-2646 GWBC; Defendants allege that the Hawaii case raised the state-law claims

22 raised here and that the instant case adds the § 1983 claims.  (Doc. 75 at 2.)  The Hawaii

23 court stayed its case.  (*Id.*; Doc. 37, Joint Proposed Case Management Plan, Sect. VIII.)

24      In the instant case, the following claims remain:[3]

25      Count I—§ 1983 claims for violations of the Eighth Amendment; specifically

26 excessive use of force and coercion and the conditions of confinement (Doc. 37 at 4-6);[4]

27

28

_____

[3] Counts V, VI, and IX were dismissed pursuant to stipulation.  (Doc. 37 at 7-8.)

Count II—state-law claim for assault and battery (*id.* at 6);

Count III—state-law claim for negligent infliction of emotional distress (*id.*);

Count IV—state-law claim for intentional infliction of emotional distress (*id.* at 6-7);

Count VII—conspiracy under 42 U.S.C § 1985(3) (*id.* at 7);

Count VIII—punitive damages (*id.* at 7-8); and

Count X—injunctive relief (*id.* at 8).

Defendants move for partial summary judgment, seeking (1) dismissal of Count I against CCA; (2) dismissal of the Count I conditions-of -confinement claim against these Defendants; (3) dismissal of Cook and Lopez; (4) dismissal of Counts III, IV, and VII against these Defendants; and (5) dismissal of Count VIII against CCA.  (Doc. 61 at 6, 13.)

In support of their motion, Defendants submit their sealed Statement of Facts (Doc. 62 (DSOF)), the affidavits of Warden Todd Thomas and others, excerpts of depositions and other exhibits.  In opposition, Plaintiffs submit their response (Doc. 67), their sealed Statement of Facts (Doc. 66 (PSSOF)), their unsealed Statement of Facts (Doc. 68 (PSOF)), counsel's declaration (Doc. 69), and exhibits.

---

[4] In their response to the pending motion, Plaintiffs argue that Count I also alleges unspecified state-law claims and that Count VII also alleges state-law conspiracy claims. (Doc. 67 at 5, 15.)  Moreover, Plaintiffs suggest in their response that they have a retaliation claim. (*See e.g.* Doc. 67 at 15.)  They argue that they were threatened because they joined in a lawsuit, which is actionable.  (*Id.*, citing *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985).  A § 1983 claim of retaliation contains five elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) the action did not reasonably advance a legitimate correctional goal.  *Rhodes v. Robinson*, 408 F.3d 559, 567-58 (9th Cir. 2005).  The alleged threats occurred *before* Plaintiffs filed the lawsuit and participating in a prison disturbance is not protected conduct.  There is no § 1983 retaliation claim, and Plaintiffs cite to no authority for a state-law claim.

## II. Preliminary Issues

### A. Stay of Trial

In their response, Plaintiffs suggest that the Court stay the trial of this matter and abstain from adjudicating the state law claims, arguing that the state law claims can be better left to the Hawaii state court. (Doc. 67 at 1, citing *Landelfeld v. Marion General Hospital*, 994 F.2d 1178, 1182 (6th Cir. 1993).) Defendants argue that the request is improperly raised in the response to their motion and that when Plaintiffs filed this case, they asserted that this Court had jurisdiction over the state-law claims. (Doc. 75 at 1-2.) They contend that the Hawaii court stayed its case to avoid piecemeal litigation and that Plaintiffs are forum shopping. (*Id.* at 2.)

Plaintiffs offer no reason why the Court should stay the trial of this matter, nor do Plaintiffs explain why the citied case supports abstaining from adjudicating the state-law claims. The requests are denied.

### B. Unsealing Defendants' Motion and Supporting Documents

Plaintiffs ask the Court to unseal Defendants' Motion and Separate Statement and accompanying materials. (Doc. 67 at 2.) This issue has been extensively litigated and a Protective Order issued. (Doc. 48.) Defendants moved to file their motion and supporting documents under seal, and Plaintiffs did not oppose. (Doc. 57.) Moreover, the request is not properly raised in the response to Defendants' motion, nor do Plaintiffs explain why the documents in question are not subject to the prior Protective Order. (Doc. 48.) The Court has recently provided limited relief from the Protective Order pursuant to a properly filed motion. (Doc. 81.) The Court will not order the documents unsealed at this time.

## III. Motion for Partial Summary Judgment

### A. CCA Liability for § 1983 Claims

The Court will deny CCA's motion because the Court finds there are triable issues of fact as to the existence of CCA policies.

### 1.      Background

Defendants argue that Plaintiffs' allegations are directed at CCA employees and that Plaintiffs do not assert or identify a custom or policy or that such a policy was the moving force behind the deprivation.  (Doc. 61 at 7.)   Plaintiffs contend that CCA can be liable "if the top management or policy maker at SCC were involved" in the wrongs alleged.  (Doc. 67 at 2-3, citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Webb v. Sloan*, 330 F.3d 1158 (9th Cir. 2003).)   Plaintiffs argue that Warden Thomas, Assistant Warden Griego, and Assistant Warden Bradley were involved in or at least acquiesced in the wrongdoing.  (Doc. 67 at 3.)   Defendants counter that Thomas, Griego, and Bradley are not Defendants and that Plaintiffs do not allege that they caused the alleged constitutional deprivations.   (Doc. 75 at 3.)   Defendants further assert that Thomas, Griego, and Bradley are not final policy makers; their duties are to run SCC in accordance with CCA policies.  (*Id.*)

### 2.      Discussion

It is well established that although municipalities and local governmental units can be sued under § 1983, they cannot be held liable solely because they employed a tortfeasor; that is, they cannot be liable on a theory of respondeat superior.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  In *Tsoa v. Desert Palace, Inc.*, the Ninth Circuit recently held that the requirements of *Monell* apply to § 1983 suits against private entities acting under color of law.  698 F.3d 1128, 1139 (9th Cir. 2012).  Thus in *Tsao*, to prevail on a claim against the defendant casino for arrest without probable cause, the plaintiff was required to show not only that the casino acted under color of state law but also that, if a constitutional violation occurred, the violation was caused by an official policy or custom of the casino.  *Id.*

A plaintiff can establish municipal—and therefore, private entity liability—in one of three ways.  *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).  First, the plaintiff can "prove that a city employee committed the alleged constitutional violation pursuant to a formal government

policy or longstanding practice of custom which constitutes the standard operating procedure of the local governmental entity." *Gillette*, 979 F.2d at 1346.  Next, the plaintiff can establish that the person who committed the constitutional violation was an official with final policy making authority and that the challenged action itself thus constituted an act of official governmental policy." *Id.*, citing *Pembaur* 475, U.S. at 480-81.[5]  Finally, the plaintiff can prove that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it."  *Gillette*, 979 F.2d at 1346-47, citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117 (1988).

A "policy" is "'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  As noted, the constitutional violation may be the result of a direct order from a policymaking official, as in *Pembaur* where sheriff's deputies referred the issue of entering the plaintiff's clinic to the County prosecutor, who commanded the officers to forcibly enter the clinic, which caused the violation of the Fourth Amendment.  *Gillette*, 979 F.2d at 1346, citing *Pembaur*, 475 U.S. at 483.  As the Court observed in *Pembaur*, a government frequently chooses a course of action designed for a particular situation and not intended to dictate decisions in later situations.  475 U.S. at 481.  If such a decision is properly made by the authorized decisionmaker, "it surely represents an act of official government 'policy' as that term is commonly understood." *Id.*

Because Plaintiffs allege violations due to both the conditions of confinement and separately for the beatings, in order to impose liability on CCA for the alleged wrong doing, Plaintiffs must establish a CCA policy regarding each of these matters.

---

[5] Defendants suggest that *Pembaur* is no longer good law and that this is not the test to show municipal liability; the Court disagrees.  (Doc. 75 at 3, citing *Webb v. Sloan*, 330 F.3d 1158, 1163-64 (9th Cir. 2003).  *Menotti*, which was decided in 2005 after *Webb*, applies the *Pembaur and Praprotnik* test.  *Menotti*, 409 F.3d at 1147.

1          **a.        Conditions of confinement in segregation**

2          The Court finds that there is a triable issue of fact as to a CCA policy regarding

3   conditions of confinement in segregation following the June 2010 disturbance.

4          Plaintiffs offer no evidence of a formal written CCA policy or that the conditions

5   to which they object were a longstanding practice.  They appear to suggest or assume that

6   Thomas was a final policy maker on this issue.   Liability attaches only if the

7   decisionmaker has final authority to establish policy with respect to the action ordered.

8   *See Pembaur*, 475 U.S. at 481.  If a policy-making official acts pursuant to an exercise of

9   discretion, without more, there is no municipal liability; "[t]he official must also be

10  responsible for establishing final government policy respecting such activity before the

11  municipality can be held liable."   *Id.* at 482-84, n. 12 (a county sheriff may have

12  discretion to hire and fire employees without also being the official responsible for

13  establishing county employment policy and in such a case, a particular decision would

14  not give rise to municipal liability).  On the other hand, if a decision on a course of action

15  is properly made by the authorized policy maker, it is official policy.  *See Pembaur*, 475

16  U.S. at 481.

17         Here, Warden Thomas attests that pursuant to CCA policy, inmates were placed in

18  administrative segregation after the disturbance.  (DSOF, Thomas Aff. ¶ 13.)   And

19  Defendants represent that decisions regarding restrictions in segregation were made and

20  employed by the SCC Warden.  (Doc. 61 at 12.)   Although Defendants assert that

21  Thomas and Griego are not final policy makers and that their duty was to run SCC in

22  accordance with CCA policy, CCA does not claim that Thomas was not authorized to

23  make the decisions regarding the conditions of confinement in segregation.   Moreover,

24  CCA does not provide evidence that Thomas's decision was constrained by other CCA

25  policies not of Thomas's making or that the decision was subject to review by some other

26  authorized policy maker.  *See Praprotnik*, 485 U.S. at 127.  Finally, the Court finds that it

27  is irrelevant to CCA liability that Thomas is not a named Defendant; Defendants cite no

28  authority for that argument.  *See Owen v. City of Independence*, 445 U.S. 622 (1980)

1   (jury may hold municipality liable even if it finds that the policymaker is protected by

2   qualified immunity).

3        The Court finds that there is a triable issue of fact whether Thomas's decision

4   regarding the conditions of confinement for these inmates was a decision of a final policy

5   maker for purposes of CCA liability.  *See Hyland v. Wonder*, 117 F.3d 405 (9th Cir.

6   1997), amended 127 F.3d 1135 (9th Cir. 1997) (where San Francisco superior court

7   judges left the internal management of the Juvenile Probation Department to the chief

8   juvenile probation officer and did not formulate any policy regarding internal

9   management, the court found a delegation of final policy making authority to the

10  Department.)   The Court denies CCA's motion as to the conditions-of-confinement

11  claim.

12          **b.**     **Alleged beatings and coercion**

13       Likewise, Plaintiffs create a triable issue of fact that the alleged beatings and

14  coercion were caused by an official policy of CCA.

15       Thomas attests that following the July 26 incident, SCC launched an internal

16  investigation and that as part of a CCA internal investigation, it is standard operating

17  procedure to interview an inmate suspected of violating CCA policies and if possible to

18  get a written statement.  (Doc. 62, DSOF, Ex. A, Thomas Aff. ¶¶ 14, 17.)  He further

19  attests that investigator Steve Williamson and Assistant Warden Griego led and were

20  present during all of the interviews.  (*Id.* ¶ 6.)  In his deposition, Thomas testified that

21  they put into place a process whereby the interviews were conducted in the video-visit

22  room and that SORT team members were not in the video-visit room when the inmates

23  were being interviewed.   (Ex. BB, Thomas Dep. Jan. 19, 2012, 24:14-17, 25:17-25.)

24  Defendants argue that Thomas, Griego and Bradley are not named as Defendants, that

25  Plaintiffs do not establish that Thomas, Griego and Bradley caused a constitutional

26  violation, and that they are not final policy makers for CCA.  (Doc. 75 at 3.)

27       Plaintiffs respond that Thomas, Griego, and Bradley were involved in the wrong

28  doing in various ways. They allege that Griego hit Santos with a pad and Thomas was

present and made no objection and that Griego was nearby and in charge when Luhia was beaten. (Doc. 67 at 3; PSOF(unsealed) ¶¶ 1-3.) In addition, they argue that Thomas and Griego made statements from which the jury could infer that Thomas and Griego were aware that inmates would be beaten when they entered the multi-purpose room and that the multi-purpose room is near the video visit room where Thomas and Griego were present. (Doc. 67 at 3; PSOF(unsealed) ¶¶ 4-8.) Plaintiffs further allege that after Defendant Schneider beat an inmate, he thanked Bradley, who responded "no problem." (PSOF ¶ 12, Togia Decl. ¶ 3.) Plaintiffs also allege that when they made complaints about the beatings, Thomas threatened them and complained about the Hawaii employee who concluded that the beatings had occurred. (PSOF ¶ 15; PSSOF ¶¶ 5-6.) Finally, Plaintiffs complain that "top management" allowed video tapes that still existed to be erased, although they tapes could have provided proof of the beatings. (PSOF ¶¶ 7-17.)

In their reply, Defendants contend that even if Thomas, Griego, and Bradley are final policy makers, their conduct cited by Plaintiffs is not unconstitutional and that awareness that Plaintiffs would be beaten is "far short of causing the deprivation" and does not give rise to CCA liability. (Doc. 75 at 4.)

The Court finds that much of the conduct cited by Plaintiffs is either not supported by the record or the statements are too conclusory or speculative to defeat summary judgment. For example, as to Thomas's presence when Santos was hit, Santos testified in his deposition that Griego hit him on the shoulder, not hard with a pad. (PSSOF, Santos Dep., Mar. 26, 2012, 119:3-7 (64-18 at 4).) Luhia attests that when he was beaten he could hear Griego downstairs shouting orders and that Griego would have been able to hear what was happening. (PSOF ¶ 1; Luhia Decl. ¶ 3 (Doc. 68-9 at 3.) Luhia's claim that Griego could hear him is speculation.

But the Court believes that if Thomas and Griego knew during the investigation that inmates were being beaten after refusing to give statements and that Thomas and Griego took no steps to stop the beatings, that would be evidence of a de facto policy regarding the manner of investigation of the July 26 incident or evidence of ratification of

1   the alleged ongoing constitutional violations. Although a policy maker's knowledge of an

2   unconstitutional act is not by itself ratification, if there is evidence of an affirmative

3   agreement or deliberate indifference to an unconstitutional act, there is an issue of fact as

4   to ratification; in other words, a policy maker's refusal to overrule a completed act is

5   different from failure to stop ongoing violations. *Christie v. Iopa*, 176 F.3d 1231, 1239

6   (9th Cir. 1999).  In *Christie*, the court found a question of fact as to municipal liability

7   where there was evidence of the policy maker's affirmative approval of ongoing

8   constitutional violations as well as deliberate indifference to them.  *Id.* at 1240.

9       Plaintiffs cite the following to support their claim that Thomas and Griego knew

10  that inmates would be beaten when taken into the multi-purpose room:

12      Butler attests that in the video visit room, Griego threatened that he knew
        where Butler's family was and would get them and that they would make
13      him talk and write a statement.  Thomas said I've got something for you
        and asked if Butler knew what he had coming.  Butler further attests that
14      Griego then called a SORT team member to get Butler and that he was then
15      taken into the multi-purpose room and assaulted by various SORT
        members.  (PSOF, Butler Decl. ¶¶ 5-6.)

17      Iiga attests that he was taken to the Video Visit Room and told Griego he
18      did not know what had happened during the incident and that he had
        blacked out.  He said he would not write a statement to which Griego
19      replied "we will see about that."  Iiga was then grabbed by the SORT team;
        Griego told the SORT team that if Iiga did not write a statement to show
20      him the meaning of blackout.  Iiga was taken to the Multi-Purpose Room
21      where he was grabbed by the hair and had his head slammed into the table.
        (*Id.*, Iiga Decl. ¶¶ 1-3.)

23      Luhia attests that he was taken to the Video Visit Room where Griego,
        Bradley, and others were present.  Griego threatened to have someone in
24      uniform pay Luhia's family a visit and to have 15 or 20 of his men come in
25      and jump him.  Two other persons present "acted as if they were about to
        shoot [him] with a can of mace in the face."  (*Id.* Luhia Decl. ¶ 5.)  Luhia
26      was then taken by SORT team members to the adjacent Multi-Purpose
        Room where his head was slammed on the table and he was kicked, kneed
27      and punched in the face.  On July 29, SORT team members went to his cell;
28      Thomas was there and said that if he could, he would personally break
        Luhia's back.  (Luhia Decl. ¶¶ 5-7.)

1

2

3

Thompson attests that on August 26, Thomas came to his cell and said that he wanted to kick Thompson's ass himself but he was not that dumb.  (*Id.*, Thompson Decl. ¶ 18.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that there is evidence from which a jury could infer that Thomas and Griego were aware at the time of the alleged beatings that SORT team members were engaged in ongoing constitutional violations.  The evidence suggests that Thomas and Griego knew that immediately after Butler, Iiga, and Luhia refused to make statements and after Thomas or Griego made threatening remarks, including threats of physical violence, the inmates were taken directly to the multi-purpose room by Sort team members.  There is evidence that the multi-purpose room was adjacent to the room where Thomas and Griego made the threats.  Butler, Iiga, and Luhia attest that they were beaten in the multi-purpose room immediately after the interviews with Griego and Thomas.  Thomas and Griego do not claim to have ordered no retaliation for the assault on the Lieutenant, and Defendants offer no innocent explanation or evidence regarding why Plaintiffs were taken to the multi-purpose room by SORT team members.  The proximity in time and space— immediately after refusing to give statements and adjacent rooms—suggests that Thomas and Griego were aware of the alleged beatings.  And Iiga attests that Griego told a SORT team member to show Iiga what a blackout was; a jury could infer that Griego was directing the SORT team member to use physical violence.  Finally, Thomas's alleged statement that he would have "kicked [Thompson's] ass himself" suggests Thomas's knowledge of beatings by others, and Defendants offer no evidence that anyone was discharged or reprimanded.

24

25

26

27

Thus, a jury could infer Thomas and Griego's awareness of the alleged beatings and their failure to act, resulting in a policy that caused the injury.  *See Menotti*, 409 F.3d at 1148 (a municipal policy to restrict speech at the 1999 World Trade Organization (WTO) conference could be inferred based on evidence of repeated constitutional

28

1  violations and absence of evidence that police officers were discharged or reprimanded

2  for excluding only anti-WTO protesters from a restricted zone).

3          As to whether Thomas and Griego were policy makers, CCA does not claim that

4  either was not authorized to make decisions regarding the manner of the investigation or

5  that their decisions were constrained by other CCA policies or that the decision was

6  subject to review by some other authorized policy maker.  *See Praprotnik*, 485 U.S. at

7  127; *see also Menotti*, 409 F.3d at 1147 (municipality's chief policy maker delegated his

8  authority to another, who in turn, delegated the responsibility).   The Court denies CCA's

9  motion as to the claim for alleged beatings by individual Defendants.

10                 **c.      CCA liability under respondeat superior for state law claims**

11         In their response, Plaintiffs assert that apart from § 1983, under state law, CCA

12 should remain liable for the torts of its employees, arguing the Defendants do not contest

13 that CCA has respondeat superior liability under state law.  (Doc. 67 at 5, citing *Minneci*

14 *v. Pollard*, 181 L.Ed. 2d 606, 610 (2012)).  They now claim that in addition to referring

15 to § 1983, Count I also alleges relief against CCA under state law, citing to various

16 allegations such as Defendants were employed by CCA.  (Doc. 67 at 5.)  They contend

17 that pleadings should be liberally construed and ambiguities resolved in favor of the

18 claim attempted to be stated.  Defendants argue there is no state law claim in Count I

19 because the FAC contains several specific state law claims, Count I merely states the

20 factual allegations and standards required to support the claims set out in the remaining

21 counts, and plaintiffs conceded in the Joint Proposed Case Management Plan that Count I

22 asserts a § 1983 claim.  (Doc. 75 at 4-5.)

23         Plaintiffs do not explain what state-law claims they contend they asserted in Count

24 I in addition to the state-law claims in Counts II-IV.  The Court cannot consider claims

25 that are not identified and so makes no determination on this issue at this time.

26 ///

27 ///

28 ///

- 12 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    Constitutionality of the Conditions of Confinement**

**1.    Background**

The parties agree that after the gang fight, inmates suspected of participating, assaulting the Lieutenant, and charging staff or refusing to lockdown were placed in administrative segregation.  (DSOF ¶ 4; PSOF ¶ 4.)  Most of the facts regarding the conditions are not in dispute.  (DSOF ¶¶ 10-18; PSOF ¶¶10-18 (admitted).)

> Some Plaintiffs testified they were left in their boxers for between two to seven days, but Adkins, Brandt, Kekona and Satele claim they were left in boxers for approximately two weeks, Tuivailala claims he was left in boxers for a month, and Ula does not remember how long he was left in boxers.  (DSOF ¶ 10.)

> Some Plaintiffs testified that they were not provided with a mattress until July 27, 2010, the day after or the day of their transfer to segregation, and were only provided a mattress during nighttime hours, from approximately 11:00 p.m. to 6:00 a.m.  (*Id.* ¶ 11.)

> Most Plaintiffs complained about being issued segregation toothbrushes, which are smaller with a short, white handle, or finger toothbrushes, rather than full-size toothbrushes.  All Plaintiffs who testified about this admitted that they were able to brush their teeth with the segregation or finger toothbrush they received, except Iiga who claimed he used his finger to brush his teeth.  Several Plaintiffs testified to their knowledge that full-size toothbrushes can be converted to shanks (blunt knife) to be used to injure other inmates or prison employees.  (*Id.* ¶ 12.)

> Most Plaintiffs testified that they were not issued personal razors with blades and instead were permitted to use only one electric razor that was being disinfected after each use.   Some Plaintiffs testified to their knowledge that razors could be used as weapons, and several others admitted they were not forced to use the electric razor and could have opted out of shaving.  (*Id.* ¶ 13.)

> Plaintiffs testified that they received cold sack meals, rather than hot meals while housed in segregation.  (*Id.* ¶ 14.)

> Plaintiffs testified that they had to ask for toilet paper when they needed it, and some testified they were not provided with enough toilet paper.  (*Id.* ¶ 15.)

> Plaintiffs testified that they were initially denied access to writing materials such as paper and pencils for several weeks.  (*Id.* ¶ 16.)
>
> Some Plaintiffs testified that their outgoing or incoming mail went missing, was delayed in delivery, and/or was being processed twice.  (*Id.* ¶ 17.)
>
> Plaintiffs testified that the cells were cold in the HB Unit in July – August 2010, and that they believed the temperature in the pod "was below 60" and was "freezing cold" although none could say they knew the exact temperature thermostats were set.  (*Id.* ¶ 18.)  Bradley attests that he thought the thermostats were set at between 72 and 79.  (*Id.*, Bradley Dep., January 19, 2012, 89:23-25, 90:1-2.)

The parties also agree that immediately after the gang fight and assault on the Lieutenant, several Plaintiffs had their clothing and shoes confiscated as potential evidence to be turned over to the Pinal County Sheriff or Eloy Police Department.  (DSOF ¶ 19; PSOF ¶ 19.)    According to Defendants, in the days immediately following the incident, the inmates were not permitted to wear full clothing and, instead, were placed in shorts and tee shirts.  (DSOF ¶ 19.)  This restriction was imposed because the inmates in segregation had just been involved in the gang fight and assault, were refusing to "cuff up", and were threatening to cover their windows, start fires, flood their cells, continue kicking their doors and "burn this son of a bitch down."  (*Id.*)  Plaintiff's respond that with the possible exception of Decker, after the disturbance, they did not disobey commands or refuse to cuff up or make threats.  (PSOF ¶ 19.)  In addition, they dispute that they were given tee-shirts.  (PSOF ¶  19.)

## 2. Legal Standards

"[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "Among 'unnecessary and wanton' inflictions of pain are those that are totally without penological justification."   *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (citation omitted).  On the other hand, the Constitution "'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation."

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991), quoting *Rhodes*, 452 at 347, 349.  Moreover, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 42 U.S. at 348.

To demonstrate that a prison official has deprived an inmate of humane conditions in violation of the Eighth Amendment, two requirements must be met─one objective and one subjective.  *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000).  First, "the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities."  *Id.* (internal citation omitted).  The subjective prong requires the inmate to demonstrate that the deprivation was a product of "deliberate indifference" by prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).  Deliberate indifference occurs only if a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exits, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S.  825, 837 (1994).

In determining whether a violation has occurred, a court should consider the circumstances, nature, and duration of a deprivation of these necessities.  *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  "The more basic the need, the shorter the time it can be withheld."  *Id.*, citing *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982).

### 3.    Discussion

#### a.    Legitimate penological justification

Defendants contend that the restrictions were imposed for legitimate, non-punitive reasons of maintaining security and order and operating the prison after a large-scale gang fight and an assault on a SCC employee.  (Doc. 61 at 9, citing *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008).)   They were placed in segregation pending the SCC investigation and to prevent further fights and disturbances.   (DSOF ¶ 4.) Plaintiffs argue that whether there were legitimate justifications for the restrictive

conditions is an issue of fact because only one inmate broke a sprinkler head, yet many inmates were punished.  (Doc. 67 at 7.)

Plaintiffs do not dispute the facts of the disturbance or assault on the Lieutenant. Nor do they dispute the CCA policy that following such an incident, inmates are placed in segregation pending an investigation.  Defendants allege that at the time of the disturbance involving 20-25 inmates several CCA correctional personnel entered the Hotel Alpha pod in an attempt to stop the fight and secure the inmates, but the inmates began congregating in a group together and rushed the staff members; Plaintiffs do not dispute this.  (DSOF ¶ 2; PSOF ¶ 2.)  Defendants also that after the disturbance inmates refused to cuff-up, and threatened to cover their windows, start fires and flood the cells. (DSOF ¶ 19.)  Plaintiff's deny the allegations regarding conduct after the disturbance but admit that one inmate set off the sprinkler.  (PSOF ¶ 19.)

In determining appropriate restrictions for segregation, Defendants are not limited to consideration of post-disturbance conduct.   Here, it is beyond dispute that a serious disturbance broke out with 20-25 inmates involved and that the Lieutenant was severely beaten.  Confinement in administrative segregation by itself, even if based upon allegedly false information, is not unconstitutional because it "falls within the terms of confinement ordinarily contemplated by a sentence."  *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (citing *Toussaint v. McCarthy*, 801 F.2d 1080, 1091-92 (9th Cir. 1986)).  SCC staff was justified in placing restrictions on inmates to prevent further fights and disturbances, and Plaintiffs admit that one inmate set off the sprinkler system after placement in segregation.

It is well established that judges and juries must defer to prison officials' expert judgments regarding security measure employed in a prison.  *Norwood v. Vance*, 591 F.3d 1062, 1066 (9th Cir. 2010).  In *Bell v. Wolfish*, the Supreme Court explained:

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution

1    of policies and practices that in their judgment are needed to preserve
2    internal order and discipline and maintain institutional security.

3    *Norwood*, 591 F.3d at1066 (quoting *Bell*, 441 U.S. 520, 547 (1979). "[T]he deliberate

4    indifference standard 'incorporates due regard for prison officials' 'unenviable task of

5    keeping dangerous men in safe custody under humane conditions.'" *Norwood,* (citing

6    *Farmer*, 511 U.S. at 845 (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)).

7        The only issue here is whether the restrictions imposed unconstitutional

8    deprivations of the minimal civilized measure of life's necessities.

9                    **b.     Constitutionality of the conditions**

10       The Court finds that Plaintiffs fail to create a triable issue of fact as to the

11   allegedly unconstitutional conditions of confinement.

12       Defendants argue that the allegations regarding the deprivations in segregation are

13   not objectively sufficiently serious to result in the denial of "the minimal civilized

14   measure of life's necessities."   (Doc. 61 at 9, citing *Farmer*, 511 U.S. at 834.)   Plaintiffs

15   contend that this is a question of fact.  (Doc. 67 at 7.)  They also contend that whether or

16   not one or more of the deprivations standing alone would violate § 1983, taken as a

17   whole the claims are supported with sufficient evidence.  (*Id.* PSSOF ¶ 32, citing *Mitchell*

18   *v. Maynard*, 80 F.3d 1433 (10th Cir. 1996).)

19       As the Ninth Circuit Court of Appeals recently reiterated, although "some

20   conditions of confinement may establish an Eighth Amendment violation 'in

21   combination' when each would not do so alone," this only applies when the conditions

22   "have a mutually enforcing effect that produces the deprivation of a single, identifiable

23   human need such as food, warmth, or exercise—for example, a low cell temperature at

24   night combined with a failure to issue blankets." *Chappell v. Mandeville*, 706 F.3d 1052,

25   1061 (9th Cir. 2013), citing *Wilson v. Seiter*, 501 U.S. 294, 304, (1991); *Osolinski v.*

26   *Kane*, 92 F.3d 934, 937-38 (9th Cir. 1996).

27       Plaintiffs allege that they were left in only their boxers for some period and that

28   the temperature was cold; because these conditions have a mutually enforcing effect, the

1    Court will consider these conditions together. But the remaining conditions will be
2    considered separately.

3                          **(1)      Boxers and cold temperatures**

4            As to the boxer shorts and cold temperature, Defendants claim that Plaintiffs also
5    had tee-shirts, which some Plaintiffs dispute.  Assuming Plaintiffs did not have tee-shirts,
6    the record shows that Plaintiffs claim they were left with only boxers for periods varying
7    from two to seven days, two weeks, or about a month.  But Plaintiffs do not point to
8    evidence regarding the duration of the cold temperature.[6]   Duration of a condition is
9    critical to determining whether a constitutional violation occurred.  *See Johnson*, 217
10   F.3d at 731.  In *Johnson* and *Baca v. Stewart*, 217 F.3d at 732, the Ninth Circuit Court of
11   Appeals considered consolidated cases where the plaintiff classes complained about
12   conditions of confinement following two different major disturbances at Arizona
13   Department of Corrections facilities.  In *Johnson*, the plaintiffs complained about shelter,
14   food, drinking water, and sanitation when they were outside for four days in August, and
15   in *Baca*, the plaintiffs complained about subfreezing temperatures and sanitation when
16   they were outside for three days in December.  In *Johnson*, the evidence showed that
17   many inmates required treatment for heat-related medical problems and that at night,
18   when temperatures fell into the 70s, they were not provided blankets or other coverings.
19   Id. at 730.  In *Baca*, the plaintiffs testified to exposure to subfreezing temperatures and
20   that blankets were not distributed until they had been lying motionless in the dirt for five
21   to nine hours.  *Id.* at 732.  The court found that both the *Johnson* and the *Baca* inmates
22   had been subjected to sufficiently serious deprivations to violate the Eighth Amendment.
23   *Id.* at 732, 734.

24

25   ---

     [6] In fact, the record does not disclose the length of time Plaintiffs were in administrative
26   segregation.  The burden is on Plaintiffs to establish facts demonstrating a constitutional
     violation.   On motion for summary judgment, a district court does not have the duty to
27   search for evidence that would create a factual dispute.  *Bias v. Moynihan*, 508 F.3d
     1212, 1219 (9th Cir. 2007).
28

1    The Court finds that the present case is distinguishable.  Although the record
2    shows how long Plaintiffs allege to have been permitted only boxers, they point to no
3    evidence regarding the duration of the confinement in administrative segregation and
4    exposure to the allegedly cold temperatures.  Moreover, they do not complain that they
5    did not have blankets.  Thus, there is insufficient evidence from which to conclude that
6    the combination of the two factors established a sufficiently serious deprivation.  And
7    Plaintiffs offer no evidence of deliberate indifference.  For example, there is no evidence
8    that the temperature in the Unit was set colder than it had been before most of the
9    clothing was taken or that inmates complained to Thomas about the temperature and he
10   did not respond.

11          Finally, the Court finds that by itself, being permitted to wear only boxers during
12   the summer time for the periods alleged is not a sufficiently serious deprivation to rise to
13   an Eighth Amendment violation.

14                    **(2)    Mattresses**

15          As to the one-night deprivation of mattresses, the Ninth Circuit has held that
16   "mattress deprivation 'for only one night [was] insufficient to state an Eighth
17   Amendment violation.'"  *Chappell*, 706 F.3d at 1060, *citing Hernandez v. Denton*, 861
18   F.2d 1421, 1424 (9th Cir. 1988), *vacated on other grounds*, 493 U.S. 801 (1989).
19   Plaintiffs also claim that they were only provided mattresses from approximately 11:00
20   pm until 6:00 am, but they do not offer evidence as to the duration of this condition or
21   evidence of how they were injured by only having the mattresses during the hours when
22   most people are asleep.  There is insufficient evidence of an objectively serious
23   deprivation.  And because they do not assert harm, there is no evidence of deliberate
24   indifference to a serious risk of harm.

25                    **(3)    Hygiene items**

26          Plaintiffs' complaints about hygiene items are also not objectively serious enough
27   to violate the Eighth Amendment.

28          A complete denial of personal hygiene items violates the Eighth Amendment.  *See*

1    *Keenan v. Hall*, 83 F.3d 1083, 1089-91 (9th Cir. 1996) (the court found a disputed issue

2    of fact where the plaintiff alleged the defendants gave him personal hygiene items only

3    when he could pay for them and that his indigency forced him to choose between hygiene

4    items and legal supplies).  And subjecting an inmate to lack of sanitation that is severe or

5    prolonged can rise also to a constitutional deprivation.  *Anderson v. County of Kern*, 45

6    F.3d 1310, 1314 (9th Cir. 1995) (no Eighth Amendment violation where inmates were

7    shackled to a grate over a pit toilet for a matter of hours); *see Hutto v. Finney*, 437 U.S.

8    678, 686-87 (1978).   Therefore, prison officials must provide inmates with adequate

9    sanitation.  *See Johnson*, 217 F.3d at 731.

10          The facts in the present case are distinguishable from *Keenan* and *Johnson*.  In

11   *Keenan*, the court found a disputed issue of fact where the plaintiff alleged that the

12   defendants gave him personal hygiene items only when he could pay for them and that

13   his indigent status forced him to choose between hygiene items and legal supplies.  83

14   F.3d at 1091.  In *Johnson*, the plaintiffs asserted that for the first night they spent in the

15   yard, they were not allowed to move from a prone position even to relieve themselves,

16   that later they did not have adequate access to toilets to avoid soiling themselves, and that

17   they had to continue to wear the soiled clothing for the remaining time in the yard.  217

18   F.3d at 730.  In *Baca*, inmates complained of conditions that resulted in inmates urinating

19   on one another.  *Id.* at 733.

20          In the present case, Plaintiffs were provided toothbrushes, albeit not the ones they

21   would have preferred and there is evidence that regular toothbrushes can be converted to

22   weapons.  Inmates were also provided an electric razor and could have forgone shaving.

23   Although they complain that the shared razor could have exposed them to Hepatitis C,

24   Defendants assert that it was sterilized between uses.   (PSOF ¶ 22; DSOF ¶ 22.)

25   Plaintiffs do not dispute this.  As to toilet paper, they alleged that they received it when

26   they asked for it, although some complained that the amounts were inadequate.  But they

27   do not point to evidence that they soiled themselves and were unable to clean themselves

28   or change their boxers.   And as with the other conditions, Plaintiffs fail to point to

evidence of the duration of the conditions.    Moreover, they admitted that they experienced no harm from the conditions, other than Butler sustaining bleeding gums. (DSOF ¶ 23(a) and (e); PSSOF ¶ 30.)  And they point to no evidence regarding how long he experienced bleeding gums, so there is no evidence of a serious risk to health, or evidence that he complained.    Thus, Plaintiffs fail to create a triable issue of fact regarding a constitutional deprivation or deliberate indifference as to the hygiene items.

### (4)    Meals

Plaintiffs complain that they received only cold sack meals while in segregation. "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).  "The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation." *Id.* (internal citations omitted).  On the other hand, if an inmate is served meals with insufficient calories for long periods of time, he may be able to demonstrate a violation of his right against cruel and unusual punishment. *Id.*

Here, Plaintiffs point to no evidence regarding the duration of this condition, and they do not claim that the food had insufficient calories or that it was spoiled. *Compare Johnson*, 217 F.3d at 730, 732.  They admit they were not injured.  (DSOF ¶ 23(b)-(d).)  Plaintiffs fail to create a triable issue of fact regarding a constitutional deprivation or deliberate indifference as to the meals.

### (5)    Access to writing materials and mail

Finally, Plaintiffs complain that they initially were denied access to writing materials such as paper and pens, and some Plaintiffs claim that their outgoing or income mail went missing, was delayed in delivery, or was being processed twice. "In analyzing claims of Eighth Amendment violations, the courts must look at discrete areas of basic human needs. As we have recently held, '(A)n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety.'" *Hoptowit*, 682 F.2 at 1246, *citing*

*Wright v. Rushen*, 642 F.2d 1129, 1132-33 (9th Cir. 1981).  Plaintiffs cite no authority holding that a brief denial of writing materials or delay in receiving mail constitute an *Eighth* Amendment violation.  And mere delay in receiving mail does not state a First Amendment claim; a plaintiff must show that he suffered some real injury.  *Morgan v. Montanya*, 516 F.2d 1367, 1371 (2nd Cir. 1975); *Harris v. Arpaio*, 2008 WL 3845416, at *4 (D. Ariz. Aug. 18, 2008) (same); *see also Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998) (a short term intrusion on a First Amendment right does not constitute a substantial burden); *Stevenson v. Koskey*, 877 F.2d 1435, 1441 (9th Cir. 1989) (single instance of inadvertent opening of legal mail outside an inmate's presence, while not to be condoned, is not actionable as a constitutional violation).

### c.    Individual Defendants

The Court finds that even if there is a triable issue of fact regarding the constitutionality of the conditions of confinement, there is no claim against the individual Defendants because Plaintiffs fail to adequately link them to the alleged constitutional deprivation.

Defendants argue that Plaintiff's cannot make a causal connection between the individual Defendants and the conduct alleged.  (*Id.* at 9, citing *Rizzo v. Goode*, 423 U.S. 362, 372-77 (1976).)  Plaintiffs assert that the SORT team was "in control" of the unit. But this is nothing more than a conclusory statement, and Plaintiffs point to no evidence regarding the conduct of the individual Defendants and the conditions of confinement. More important, Plaintiffs do not dispute Defendants' assertion that decisions regarding restrictions in segregation were made and employed by Warden Thomas.  And Plaintiffs do not claim that the individual Defendants imposed restrictions on inmates in segregation that were not in conformity with the decisions regarding restrictions made by Thomas.

Where plaintiffs seek to hold defendants personally liable for damages based on deliberate indifference and a constitutional deprivation, the causal-connection inquiry must be individualized and focused on the duties and responsibility of each individual

defendant whose acts or omissions are alleged to have caused the deprivation. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (internal citation omitted). A court considers whether the individual defendants were in a position to take steps to avert the alleged harm but failed to do so intentionally or with deliberate indifference. *Id.* Thus, a court must consider the "duties, discretion, and means of each defendant," and the inmate must establish individual fault. *Id.*

Here, Plaintiffs offer no argument, much less evidence, that any individual Defendants had either the duty or discretion to override the decisions of Warden Thomas regarding the conditions of confinement in segregation. Without evidence of individual conduct or individual duty or discretion to impose restrictions other than those ordered by Thomas, Plaintiffs fail to create a triable issue of fact as to liability of the individual Defendants.

The Court will dismiss the § 1983 claim in Count I for unconstitutional conditions of confinement.

### C.    Cook and Lopez

#### 1.    Cook

Plaintiffs have served the wrong employee Cook; the Defendant Cook who waived service of Plaintiffs' FAC was not a member of the SORT team at the time of the conduct alleged in Plaintiffs' FAC. (Doc. 61 at 13.) In their response to the motion, Plaintiffs ask for additional time for service of the Cook who was a SORT team member, arguing that defense counsel agreed to accept service and arranged for a waiver of service form signed by J. Cook. Plaintiffs further argue that Defendants "announce" in their motion that the Cook who waived service was not a member of the SORT team at the time of the conduct alleged. (Doc. 67 at 10.) Plaintiff's claim that Defendants' initial and supplemental disclosures suggested that J. Cook was the correct Defendant because the disclosure state that J. Cook will testify about "his personal knowledge of CCA's response to and subsequent incident on July 26, 2010. . . ." (*Id.*) They ask for additional time to serve the correct Cook.

1    In their reply, Defendants assert that Plaintiffs' claim of ignorance regarding the
2   identity of the correct Cook is contradicted by the record.  Although there are two CCA
3   employees with the last name of Cook who served on CCA's SORT team, Defendants
4   claim that they twice identified the Cook who was on the team in July 2010 when the
5   incident occurred: in April 2012, in response to an interrogatory to CCA in the Hawaii
6   state case asking it to identify "the correction officer named Cook who was a member of
7   the SORT team as of July, 2010," and in response to a second interrogatory after
8   commencement of this lawsuit.  (DSSOF ¶¶ 2, 3, Exs. B & C). CCA responded by
9   providing the officer's full name and last known contact information both times.  (*Id.*)
10  The information regarding the correct Cook was first disclosed in April 2012 and again in
11  July 2013.

12    The Court will dismiss J. Cook, who was apparently not involved in the incident.

13    The Court will deny without prejudice the request for late service on C. Cook.
14  Plaintiffs have not filed a proper motion, have not properly briefed the law regarding late
15  service, and have not replied to Defendants' assertion that Plaintiffs knew the address of
16  the correct Cook as early as April 2012.

17            **2.    Lopez**

18    Defendants also argue that Plaintiffs fail to identify any wrongdoing allegedly
19  committed by Chief Lopez, that no evidence establishes any wrongdoing by Lopez, and
20  that all Plaintiffs admit that they "were not physically assaulted or battered by Chief
21  Lopez." (Doc. 61 at 13; DSOF at ¶ 23(f).)  Although Defendants claim that Adkins never
22  testified at his deposition to being choked by Lopez, Plaintiffs contend that Adkins attests
23  in his declaration to being choked by Lopez.  (PSOF ¶ 29, Adkins Decl. ¶ 5.)  But Adkins
24  neither admitted nor denied nor otherwise answered the Request for Admissions
25  regarding an assault by Lopez.  (DSOF, Ex. GG. Adkins, Req. for Adm. No. 3.)  Pursuant
26  to Federal Rule of Civil Procedure 36(a)(3) and (4), the matter is admitted, and Plaintiffs
27  do not claim that they made a motion to withdraw the admission pursuant to Rule 36(b).
28  The Court will grant the request to dismiss Lopez.

**D.      State Law Claims**

      **1.      Choice of law**

Whether Hawaii or Arizona law applies to the state-law claims is in dispute.  (Doc. 37 at 12, 13.)  Defendants' arguments regarding the state-law claims assume that Arizona law applies, and Plaintiffs respond arguing both Arizona and Hawaii law.   (Doc. 67 at 12-16.)

The Court holds that Arizona law applies to the state-law claims.

In a federal-question action involving supplemental jurisdiction over state law claims, the Court applies the choice of law rules of the forum state.  *Paulson v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir.  2009), citing *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) ("When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law."); *Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n. 2 (9th Cir. 2000) ("[A] federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction."); *see also Klaxon Co. v. Stentor Electric Mfg., Co*., 313 U.S. 487, 496 (1941); *Ledesma v. Jack Stewart Produce, Inc*., 816 F.2d 482, 484 (9th Cir. 1987).

Under Arizona law, "courts are required to resolve tort issues under the law of the state having the most significant relationship to both the occurrence and the parties with respect to any particular questions."   *Sutter Home Winery, Inc. v. Vintage Selections*, 971 F.2d 401, 407 (9th Cir. 1992), citing *Bates v. Superior Court*, *Maricopa County*, 749 P.2d 1367, 1370 (1988).  Arizona courts apply the Restatement (Second) of Conflicts of Laws (1971) and consider four factors in making this determination: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile of the parties, and (4) the place where the parties' relationship is centered. *Bates*, 749 P.2d at 1369-70.  The analysis is qualitative not quantitative.  *Id.* at 1370.

In *Bates*, the court noted that the Restatement provides a specific qualitative guideline for personal injury cases:

1

2

3

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the [§ 6 Choice-of-Law Principles] to the occurrence and the parties, in which event the local law of the other state will be applied.

4

*Bates*, 749 P.2d at 1370, citing Restatement § 146.

5

6

Plaintiffs argue that they are Hawaii inmates serving time under sentences from

7

Hawaii courts, housed by CCA in Arizona pursuant to a contract between the SOH and

8

CCA and that the Hawaii Contract Monitor, Defendant Iaone, was at the facility during

9

the relevant times.  (Doc. 67 at 12.)  They argue that "[a]lthough the emotional distress

10

was inflicted in Arizona, the laws of the State of Hawaii would appear to have a greater

11

interest in governing the relations of the parties."   They do not explain this apparent

greater interest.

12

As Defendants point out, applying the relevant four factors, it is undisputed that

13

the alleged injuries and conduct occurred in Arizona.  (Doc. 75 at 10.)  These factors

14

weigh in favor of applying Arizona law.  As to domicile and residence, Defendants argue

15

that it is neutral because Plaintiffs are domiciled in Hawaii and Defendants are domiciled

16

in Arizona.   (*Id.*)   But, in fact, CCA is a Tennessee corporation doing business in

17

Arizona; Defendant Iaone, who is not a party to this motion, may not be domiciled in

18

Arizona; and the SOH is a Defendant.   The commentary to the Restatement provides that

19

the relative importance of this factor varies with the nature of the interest and that when

20

the interest affected is a personal one, residence is of greater importance than if the

21

interest is a business or financial one.  Restatement (Second) of Conflicts § 145 (1971),

22

advisory comm. e.  But the commentary also notes that where the injury does not occur in

23

two or more states, the importance of this factor as a contact depends on the extent to

24

which it is grouped with other contacts and that the fact that one of the parties is

25

domiciled in a particular state carries little weight of itself.  *Id.*  Thus, the Court finds that

26

domicile is not a particularly significant factor here.

27

Regarding the place where the relationship, if any, is centered, the commentary

28

notes that when the injury was caused by an act done in the course of the relationship, the

1   place where the relationship is centered must be considered and will be especially

2   important if it is the same as the place of injury or the conduct.  Here, the relationship

3   between Plaintiffs and Defendants is centered in Arizona where Plaintiffs were in custody

4   in the Arizona facility.  *See Sutter Home Winery, Inc.*, 971 F.2d at 407.

5          Considering the four factors, because the alleged injury and conduct occurred in

6   Arizona where the relationship between the parties is centered, the Court holds that

7   Arizona law applies to the state-law claims.

8                    **2.       Counts III and IV—Emotional Distress**

9          The Court will deny Defendants' motion as to the claims in Counts III and IV for

10  emotional distress.

11         Count III is for negligent infliction of emotional distress.  Defendants assert that to

12  establish their claim of negligent infliction of emotional distress, Plaintiffs must prove

13  that, among other things, their emotional distress resulted in physical injury or illness.

14  (Doc. 61 at 13, citing *Loos v. Lowes HIW, Inc.*, 796 F.Supp.2d. 1013, 1020 (D. Ariz.

15  2011).)  Defendants maintain that there must be a serious physical injury and that

16  transitory injury is insufficient.  (Doc. 61 at 14, citing *Burns v. Jaquays Mining Corp.*,

17  752 P.2d 28, 32 (App. 1987) (quoting Restatement (Second) of Torts § 436A (1965), cmt.

18  c); *Gau v. Smitty's Super Valu, Inc.*, 901 P.2d 455, 457 (App. 1995)).  They claim that

19  except for Santos, all of the Plaintiffs admit that no medical provider has said any

20  Plaintiff suffers permanent physical injury as a result of injuries suffered while in

21  segregation and that no Plaintiff presented evidence of serious physical injury resulting

22  from emotional distress.  (Doc. 61 at 14.)  Plaintiffs dispute that the law requires that

23  physical injury flow from the emotional injury and argue that it is sufficient that mental

24  anguish is accompanied by or manifested as a physical injury.  (Doc. 67 at 14, citing *Gau*,

25  901 P.2d at 457.)

26         Under Arizona law, a plaintiff can recover damages for emotional distress and

27  accompanying physical injury as a result of a defendant's negligence when the plaintiff is

28  physically involved in an accident and "suffered some impact triggering the emotional

responses." *Ball v. Prentice*, 781 P.2d 628, 630 (Ariz. App. 1989) (citing Prosser and Keeton on the Law of Torts § 54 at 363-64 (5th ed. 1984) and noting that "'impact' has meant a slight blow, a trifling burn, etc.)).  Ball, who was driving a car involved in an automobile collision that resulted in another driver's death and who himself suffered minor physical injuries, testified at his deposition that he suffered extreme shock and continued to suffer loss of sleep, emotional agitation, tension, headaches fear, and other physical and emotional problems; he had not sought treatment to correct the alleged injuries.  *Id.* at 629-30.  The court found that an automobile collision that kills a person and damages two vehicles is clearly an "impact," and Ball was a victim, not a bystander. The court held that whether his "emotional problems, nausea, sleeplessness, tension and headaches are causally connected to the accident and the extent and duration of those injuries is a matter for jury determination."  *Id.*

In the present case, the Court holds that the alleged beatings would qualify as an "impact" suffered by Plaintiffs, who were victims, not bystanders.[7]  The Court denies the motion for summary judgment on Count III.  *See id.*

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must demonstrate facts showing that: (1) the conduct by the defendant is "extreme" and "outrageous"; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from his conduct; and

---

[7] Plaintiffs also state that the beatings should be enough to satisfy the Prison Litigation Reform Act (PLRA) requirement of "serious physical injury."  (Doc. 67 at 13.) The PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)."  42 U.S.C. § 1997e(e).  But the PLRA applies only to federal claims.  And as to federal claims, the physical-injury requirement applies *only* to claims for mental or emotional injuries and does not bar claims for compensatory, nominal or punitive damages.  *Oliver v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002).

(3) severe emotional distress occurred as a result of the defendant's conduct.  *Citizen Publishing Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005).  Defendants argue that there is no evidence of severe emotional distress.  (Doc. 61 at 14; Doc. 75 at 10.)  Plaintiffs argue that they were beaten, some more than once; that they heard other inmates being beaten; that they feared continued beatings; and that they were threatened with harm to their families.  (Doc. 67 at 13.)  They argue that being beaten is a physical injury and that where there is a physical injury, they are entitled to recover for emotional injury resulting from the conduct.  (*Id.*)

The parties agree that no physical injury is required for a claim of intentional infliction of emotional distress.  (Doc. 67 at 12; Doc. 75 at 10.)  Defendants suggest, however, that there can be no severe emotional distress without medical evidence of permanent mental or emotional injury or need for mental or emotional care or treatment.  (Doc. 61 at 14.)  But they cite to no authority that clearly requires such evidence.  In *Ford v. Revlon, Inc.*, the court noted that there was both medical and other evidence of the plaintiff's emotional distress, noting that she testified about her emotional distress and development of physical complications caused by a stressful work environment.  734 P.2d 580, 586 (Ariz. 1987).  Arizona applies the test for intentional infliction of emotional distress set out in the Restatement (Second) of Torts, § 46 (1965).  *Midas Muffler Shop v. Ellison*, 650 P.2d 496, 499 (Ariz. App. 1982) citing *Savage v. Boies*, 77 Ariz. 355, 272 P.2d 349 (Ariz. 1954).  The Restatement (Second) of Torts 46 § provides that

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises.  . . . The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

Restatement (Second) of Torts § 46 advisory comm. (j).  In *Midas Muffler*, the court noted that the plaintiff testified that she was upset by the creditor telephone calls, they made her cry, and that she had difficulty sleeping.  *Midas Muffler*, 650 P.2d at 501.  The court found that this was not sufficiently severe for liability on a claim of intentional infliction of emotional distress.  *Id.*  The court did not find the evidence insufficient because there was no medical proof.  In fact, severe emotional distress is a matter about which a plaintiff would have personal knowledge and could testify.  *See Ball*, 781 P.2d 628, 629-30.  The Court will deny Defendants' motion as to Count IV.

### E.   Conspiracy

In the Joint Case Management Plan, Plaintiffs represented that the conspiracy claim was pursuant to 42 U.S.C. § 1985(3).  (Doc. 37 at 7.)  To maintain a claim under § 1985(3), a plaintiff must demonstrate: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, and person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.  *Sever v. Alaska Pulp Corp.* 978 F.2d 1529, 1536 (9th Cir. 1992). Plaintiffs must show an agreement or "meeting of the minds" by the defendants to violate constitutional rights in order to establish the existence of a conspiracy. *Caldeira v. County of Kaui*, 866 F.2d 1175, 1181-82 (9th Cir. 1989).  In addition, the second element requires proof that deprivation of a right was motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* (quoting *Griffith v. Breckenridge*, 403 U.S. 88, 102 (1971)).  In the Ninth Circuit, § 1985(3) is extended beyond race "only when the class in question can show that there has been a governmental determination that its members 'require and warrant special federal assistance in protecting their civil rights.'" *Sever,* 978 F.2d at 1536 (internal citations omitted).  That is, "either that the courts have designated the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or that Congress has

1    indicated through legislation that the class required special protection." *Id.*

2    Defendants assert that Plaintiffs cannot demonstrate a "meeting of the minds" or

3    that any violation was motivated by racial or class-based animus.  (Doc. 61 at 15.)  They

4    further argue that to the extent that conspirators were employed by or acted as agents of

5    CCA, the conspiracy claim is barred by the intracorporate conspiracy doctrine.  (*Id.* at 15-

6    16.)  Defendants assert that the doctrine "bars a claim of conspiracy where the allegation

7    is that an entity conspired with its employees to violate an individual's constitutional

8    rights."  (*Id.* at 16, citing *Donahoe v. Arpaio*, 869 F.Supp.2d 1020, 1074-75 (D. Ariz.

9    2012).)  They further allege that "[w]hether Plaintiffs allege that CCA participated in the

10   alleged conspiracy, or it was only between its employees makes no difference, as

11   Plaintiffs necessarily allege that the individual Defendants participated in the conspiracy

12   while in the course and scope of their employment.  (*Id.,* citing *Celestin v. City of New

13   York*, 581 F.Supp.2d 420, 434 (E.D.N.Y 2008) ("[W]here the individual defendants are

14   all employees of the institutional defendant, a claim of conspiracy will not stand."))

15   Plaintiffs do not address Defendants' arguments regarding lack of evidence of

16   racial or class based animus for a claim under § 1985(3).  Instead, they argue that the

17   conspiracy claim includes state law claims.  (Doc. 67 at 15.)  They assert that there is

18   evidence from which a jury can infer that the SOH conspired to commit the alleged

19   wrongs because John Ioane, the Hawaii Contract Manager, was present during the

20   relevant time period and dismissed inmate reports of beatings.  (*Id.* at 15-16.)

21   The Court will dismiss the conspiracy claim under § 1985(3).  As to any state law

22   claim, Plaintiffs do not cite to an Arizona case regarding a claim for civil conspiracy or

23   the elements of such a claim.  The issue is not properly briefed.

24   ## F.    Punitive Damages

25   Defendants argue that Plaintiffs' punitive damages claim under § 1983 claim

26   against CCA should be dismissed because Plaintiffs do not allege and cannot prove that

27   their alleged constitutional deprivations were the result of CCA's custom or policy and

28   that punitive damages cannot be imposed against CCA for the alleged improper conduct

of its subordinates.   (Doc. 61 at 16.)  But the Court has found that there is a triable issue of fact regarding whether the beatings were a policy of or ratification by a final policy maker.

The Court will not dismiss the punitive damages claim at this time. The request to dismiss claims for punitive damages is premature and will be denied.

**IT IS ORDERED:**

(1)    The reference to the Magistrate is withdrawn as to Defendants' Motion for Partial Summary Judgment (Doc. 61.)

(2)    Defendants' Motion for Partial Summary Judgment (Doc. 61) **is granted in part and denied in part as follows**:

(a)   **granted** as to J. Cook and Chief Lopez; they are dismissed;

(b)   **granted** as to § 1983 claims in Count I for conditions of confinement; these claims are dismissed as to all Defendants;

(c)   **granted** as to the federal conspiracy claim in Count VII; and

(d)   **denied** in all other respects.

(3)    At this time, the remaining claims are:

(a)    Count I § 1983 claim against all Defendants for beatings and coercion; and

(b)    Counts II (state-law claim for assault and battery); III (state-law claim for negligent infliction of emotional distress); IV (state-law claim for intentional infliction of emotional distress); VIII (punitive damages); and X (injunctive relief).

DATED this 28th day of March, 2014.

_____
Robert C. Broomfield
Senior United States District Judge

1  Copies to counsel of record:

2  Jess A. Lorona, Esq.
   John Rapp, Esq.
3  Attorneys for Plaintiffs

4  Daniel P. Struck. Esq.
   Rachel Love, Esq.
5  Amy L. Nguyen, Esq.
   Struck Wieneke & Love,
6  Attorneys for Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28